# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### KA 09-1216


**STATE OF LOUISIANA**

**VERSUS**

**MICHAEL D. SUMRALL**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 70400
HONORABLE VERNON BRUCE CLARK, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


**SHANNON J. GREMILLION**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Marc T. Amy, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.


**AFFIRMED.**



**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**(337) 991-9757**
**Counsel for Defendant/Appellant:**
**Michael D. Sumrall**

**Hon. Asa Allen Skinner**
**District Attorney, 30th Judicial District Court**
**P. O. Box 1188**
**Leesville, LA 71496-1188**
**(337) 239-2008**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Terry Wayne Lambright**
**Attorney at Law**
**100 S. Third St., Suite A**
**Leesville, LA 71446**
**(337) 239-6557**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Terry Wayne Lambright**
**Attorney at Law**
**100 S. Third St., Suite A**
**Leesville, LA 71446**
**(337) 239-6557**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**GREMILLION, Judge.**

Defendant, Michael D. Sumrall, was found guilty of second degree murder after trial by jury. He was given the mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. We affirm.

## FACTS

Mark Schermerhorn was murdered at his home on June 23, 2006, while Defendant and Tina Pruitt were also present. Schermerhorn was stabbed eight times. The wound on his left front chest was six and a half inches deep; it punctured the upper lobe of the left lung and penetrated the pericardial sac. The wound on the right side of his back was the same depth; it punctured the lower lobe of the right lung and broke through a rib. The blow required a significant amount of force. Six separate wounds on the left side of the back were fairly close together. Four penetrated the back of the left lung, and three of those four went through his ribs at depths of up to seven and a half inches. Each of the wounds was potentially fatal, but would not have brought about rapid death or incapacitation. Thus, the victim was still conscious and able to move after the wounds were inflicted.

Schermerhorn's body showed no defensive wounds. There were no signs of a struggle at his home. His body was positive for benzodiazepine and carisoprodol, both of which could have been prescribed, and for marijuana. His .04 blood alcohol level could have been caused by the body's decomposition, but forensic pathologist Dr. Karen F. Ross could not exclude the possibility of alcohol consumption shortly before death.

Dr. Ross found small abrasions on both of Schermerhorn's knees. Those abrasions were consistent with wounds made by the victim falling to his knees. Dr.

1

Ross believed fear or anger, along with drugs or alcohol, could impact the murderer's strength. Schermerhorn was 6'3" tall and weighed about two hundred and twenty-eight pounds.

Defendant and Pruitt admitted they were both present at the scene of the murder; thus, one or both of them was responsible. Trial testimony contained great factual detail from a number of witnesses. Defendant and Pruitt accused each other of the murder.

*Testimony of Robert Marsh, Sr.*[1]

On Friday, June 23, 2006, Defendant and his mother picked up Pruitt from the home of Robert Marsh, Sr., where Pruitt had resided for a couple of years. Marsh did not think Pruitt was expecting Defendant, but she left Marsh's home with him after about fifteen minutes, around 1:30 to 2:00 p.m. Marsh did not see Pruitt again until around 5:00 to 6:00 p.m. on Sunday, June 25, 2006. She was alone, and she said Defendant's mother had brought her to his house. Pruitt lay down on the couch in the living room and slept.

Around 2:30 to 3:00 a.m. the next morning, Marsh's son Bert woke him and said Pruitt wanted to tell him something. Pruitt was very upset and nervous and could not stay still. She said Defendant had killed Schermerhorn. Marsh told her to call the sheriff's office, and she did.

*Testimony of Tina Pruitt*

Pruitt knew Defendant only because he had come by Marsh's home a couple of times. She lived at Marsh's home even though she had her own trailer across the

---

[1]In order to distinguish between Robert Marsh, Sr. and Robert "Bert" Marsh, Jr., this opinion refers to Marsh, Sr. as "Marsh" and Marsh, Jr. as "Bert."

street.  Defendant had told her he would introduce her to someone who would help her find a job offshore.

When Pruitt and Defendant left Marsh's house, she thought they were going to talk to Defendant's boss in Pitkin.  Instead, they went to the home of Schermerhorn, whom Pruitt had known for approximately twenty-five to thirty years, and with whom she had experienced "intimate relations" in the past.  Pruitt did not know that Defendant and Schermerhorn knew each other.

When they arrived at Schermerhorn's home, she and Defendant exited the vehicle, and Defendant's mother left.  Schermerhorn met Pruitt and Defendant at the door of his double wide trailer, dressed in shorts and a shirt.

During their visit, Schermerhorn gave Defendant a Lorcet pill; Pruitt got it from Defendant and took it for her back pain.  She took no other drugs prior to the murder.  After the trio visited for thirty to forty minutes, Defendant asked Pruitt if she needed to use the restroom.  No disputes, arguments, or heated words were exchanged among any of them when she left the room.  At that point, Schermerhorn was lying on the couch, and Defendant was sitting in a chair next to the couch. While Pruitt was in the bathroom for about two minutes, she heard "a loud bam," and she thought Schermerhorn may have fallen.  She exited the bathroom and saw Defendant in the kitchen holding a large butcher knife.  Defendant said, "I just killed my best friend." She asked Defendant what kind of joke he was playing, and he told her to look around the corner.  She took one step into the living room and saw Schermerhorn lying on a broken coffee table, making a noise similar to snoring. When she told Defendant to call 911, Defendant told her to go into the kitchen while

3

he "finish[ed] him off." Pruitt thought she saw Defendant stab Schermerhorn in the stomach, but later learned he was not cut there.

Pruitt went to the kitchen and got a root beer from the refrigerator because she was nervous, upset, and scared. After she sat at the kitchen table for a couple of minutes, she reentered the living room and saw Defendant "just standing there," and she "looked down and seen [sic] all the marks on [Schermerhorn's] back." Defendant "grabbed [Schermerhorn] by the shorts and flipped him to get in his pocket," and he removed Schermerhorn's keys and wallet. Defendant then went into another room and got two long-barreled guns. Defendant told Pruitt "he could stay there two weeks but he knew it was bothering [her]," and so the pair left the trailer in Schermerhorn's vehicle with his wallet and two guns.

Pruitt and Defendant spent that Friday night at the Leesville home of Pruitt's brother, Fred Bolgiano, who was Schermerhorn's friend. Bolgiano came home drunk late that night, and Pruitt did not talk to him about the murder. At some point on Friday, after the murder, Pruitt took some Xanax and used cocaine. On Saturday morning, June 24, 2006, Pruitt and Defendant drove Schermerhorn's vehicle to EZ Pawn in Pickering, Louisiana, and pawned the two guns for $89. Pruitt and Defendant returned to Bolgiano's home and spent Saturday night there, where Defendant burned a shirt with "a couple of drops of blood on it" and a wallet in Bolgiano's yard.

When Pruitt was able to speak to Bolgiano alone, she whispered to him Defendant had killed Schermerhorn, and Bolgiano "just looked down at the floor and shook his head with a woooo look." On Sunday, June 25, 2006, Defendant called his mother and asked her to meet them at Leebo's, a convenience store on Highway 28.

4

Schermerhorn's vehicle was no longer at Bolgiano's residence at that point, and Pruitt did not know where it was. Bolgiano drove Pruitt and Defendant to Leebo's, where they met Defendant's mother. She drove Pruitt and Defendant first to Fort Polk to purchase beer, and then to the charity hospital in Alexandria to take Defendant to the psychiatric ward.[2] At Fort Polk, they dropped off Pruitt at a store while they went on the base to buy beer for the ride to Alexandria; Pruitt said they were gone only one or two minutes. During the trip to the hospital, Pruitt heard Defendant tell his mother what he had done. Pruitt told her about an incident that occurred between her and Schermerhorn when they had dated "thirty some years ago." Defendant's mother took Pruitt back to the home of Robert Marsh around 3:30 or 4:00 that afternoon.

Pruitt spoke briefly to Marsh and tried to go to sleep. Around 4:00 the next morning, Monday, Pruitt "had been sitting up shaking," and she told Bert Marsh what had happened. Bert told Pruitt she had to call the police, and he woke his father. Pruitt did not want to involve Bert because he was wanted by law enforcement. Pruitt told Marsh "the whole story." He also told her to call the police, and Pruitt contacted the Vernon Parish Sheriff's Department to report the murder.

Pruitt testified she gave "many statements" as part of the investigation; she was not totally candid in the first statement "because everybody didn't want their name brought up." She said she and Defendant had first gone to Biven's Landing after the murder, when in fact they went to Bolgiano's home. Bolgiano had told her "not to bring his name up when – if anything happened." Pruitt was charged with accessory after the fact and testified she spent one hundred and ten days in jail before she was

---

[2]The record is not clear whether Defendant went to the hospital in Alexandria or Pineville.

5

released on July 31, 2006.[3]  She was never promised anything in exchange for any statement she made.[4]

Until about a year before Defendant's trial on May 4, 2009, Pruitt had heavily abused cocaine on a regular and frequent basis for a long time, along with other drugs and alcohol.  After the murder, on the same day, she purchased cocaine before she and Defendant went to Bolgiano's home, and used it "once or twice" that day.  She used cocaine again the day after the murder, until sometime between Saturday night and daylight on Sunday.

Pruitt testified it "might be true" that she told the dispatcher to whom she reported the murder that she was concerned about things getting turned around to look as if she and Schermerhorn had a confrontation and she killed him.  Defendant and his mother told her on Sunday, on the way to the Alexandria hospital, that they would say Pruitt and Schermerhorn were fighting, and Defendant took the knife from Schermerhorn and killed him. They were trying to make "deals" with her.  Defendant made his mother believe that was what had happened, but Pruitt told her on the way back from the hospital what really happened.  Their plan was for Pruitt to stay with Defendant's mother that night, and she would take Pruitt to rehab the next day.  Pruitt testified at trial she was no longer under the influence of drugs on Sunday and Monday after the murder on Friday.

While Pruitt and Defendant were at Bolgiano's house, a number of people came and went – Louis Owers, Bert Marsh, Eric Williams, and another couple – but Pruitt never asked to leave with any of them.  Pruitt's testimony showed she had

_____

[3]Obviously, one hundred and ten days did not pass between the date of the murder on June 23, 2006 and the date of Pruitt's release on July 31, 2006.

[4]Although Pruitt was charged with being an accessory after the fact, the District Attorney's office ultimately decided not to formally charge her with any crime.

numerous opportunities to get away from Defendant, but took advantage of none of them.

Pruitt's testimony brought out inconsistencies that emerged during the sheriff's department's investigation. At one point, Pruitt told authorities she and Defendant had left Schermerhorn's car at Leebo's, when in fact, they "rented" the vehicle to Eric Williams, one of Pruitt's drug suppliers. Pruitt did not tell the truth at first because she "was trying to keep Eric from having to get in the middle of it, too." Contrary to what Marsh testified, Pruitt said Bert was passed out on the couch at Marsh's home when she arrived. In Pruitt's first statement, given at 6:03 a.m. on Monday, June 26, 2006, she said she and Defendant had spent Friday night at Biven's Landing. In her second statement, given at 2:15 p.m. the same day, she said they went to Bolgiano's home Friday night. She attributed the discrepancy to trying to cover Bolgiano and Bert. By the time she gave a third statement on July 31, 2006, she admitted taking Xanax and Soma, and using crack cocaine after the murder.

Pruitt admittedly alleged different details about what happened after the murder. However, she never, in any of the three statements she gave to police or at trial, deviated from the sequence involving the murder and the events prior to it. At some time after the murder, Pruitt was charged with conspiracy to possess cocaine and possession of marijuana.[5] She pled guilty to first offense possession of marijuana, and the conspiracy charge was dropped. She was not offered any promises or induced in any manner to take the plea.

_____

[5]The offense date was in October, 2007.

7

*Testimony of Fred Bolgiano*

Bolgiano testified Pruitt resided in her own home next door to his at the time of the murder. He first testified he had no recollection of seeing Pruitt on Friday, but he did recall seeing her on Saturday. However, he later said they arrived on Friday, when he had been "drinking a good bit." Pruitt was "with a guy" Bolgiano did not know. Bolgiano later identified Defendant from a photo lineup as the "guy." Pruitt and Defendant were already at Bolgiano's home when he arrived, and they had brought a big plastic garbage bag of beer, Hot Pockets, hamburger meat and "stuff."

At some time on Saturday, Pruitt, out of Defendant's presence, told Bolgiano Defendant had killed Schermerhorn. Pruitt was upset and "seemed like she was scared." Defendant then walked into the room, and Bolgiano did not know whether to believe Pruitt. Bolgiano also saw Defendant standing next to a fire in his yard that day, several yards away from a burn pile already there. Bolgiano did not recall anyone else at his home on Saturday.

Defendant and Pruitt left Bolgiano's home around two or three o'clock on Sunday afternoon. He took them to Leebo's, at the intersection of Highways 117 and 28, where they were going to meet Defendant's mother. At that point, the vehicle in which they had arrived was no longer at Bolgiano's home, and he did not know what had happened to it.

*Testimony of Yvonne "Betty" Sumrall*

Yvonne "Betty" Sumrall, Defendant's mother, took her son into Leesville from Pitkin on Friday, June 23, 2006. She thinks they may have gone by Schermerhorn's house before they came into town, but she was not sure. Schermerhorn frequently called her or Defendant to help him do things.

8

On their way out of Leesville, heading home, they stopped to see Robert Marsh. Defendant went inside; a few minutes later, Pruitt, then Defendant, came out of the house. They got in the car, and Pruitt told Sumrall she needed a ride to Schermerhorn's house because he wanted to see her. Defendant had been staying at Schermerhorn's house, about a half mile from Sumrall's home. When they arrived, Pruitt told her the last time she was there (without saying how long ago that had been), Schermerhorn had beaten her, thrown her down the steps, and shot at her as she ran up the driveway. Sumrall dropped off Defendant and Pruitt around 5:00 or 6:00 p.m. and left before they went inside.

Sumrall did not hear from Defendant anymore on Friday or Saturday. On Sunday morning, he called Sumrall and asked her to pick him up at Leebo's. She arrived around 1:30 or 2:00 p.m. to find Defendant and Pruitt. Had she known Pruitt would be there also, she would not have gone. Defendant said he was sick and needed to go to the hospital in Alexandria. Defendant had on the same clothes he had been wearing on Friday, and they were clean. Sumrall said Defendant and Schermerhorn had known each other for fifteen or twenty years, and Defendant "cared a lot" about Schermerhorn.

After leaving Leebo's, Sumrall went to Fort Polk and purchased gas and beer. Because Pruitt did not have identification, they left her at a convenience store outside the base. They returned to pick up Pruitt thirty to forty-five minutes later. Sitting in the back with the radio playing, Sumrall could not have heard anything they might have said to her. There was no discussion of a murder; in fact, she had no conversation with her son. Sumrall was furious with Defendant because "he was suppose[d] to [have] been by himself."

9

When Defendant got out of the vehicle at the charity hospital in Alexandria, Pruitt said she could drive Sumrall home. Pruitt was very distracted; "something was radically wrong," but again, she never said anything about Schermerhorn's murder. Sumrall made no agreement to take Pruitt to rehab the next day.

*Testimony of Robert "Bert" Marsh, Jr.*

Bert Marsh had known Schermerhorn and Pruitt all his life, and he saw Pruitt every day at drug and alcohol parties. According to Bert, Pruitt did not have a reputation for being truthful, and she was known to be violent. Bert went to Bolgiano's home in the early evening on Saturday, June 24, 2006, with Louis Owers. Defendant and Pruitt arrived around dark, in a black car driven by "a colored man" known as "Little E." Defendant and Pruitt came inside for an evening of "partying," and the driver left in the vehicle. Bert noticed no stains or blood on Defendant's t-shirt and pants.

Defendant left Bolgiano's home with Bert and Owers for about an hour and a half. Defendant never said anything about Schermerhorn's murder during that time. Bert had known Defendant to "drink and smoke weed," but that night, Defendant also used cocaine, which Bert found odd. Bert left the party around 2:00 or 3:00 Sunday morning; Defendant, Pruitt, and Bolgiano were all still awake at that time. Pruitt did not act unusually at the party.

Pruitt had told Bert that Schermerhorn and Larry Engles owed her money, and she was so mad she had taken things out of Engles' home. Bert was asleep on the couch at his father's house early on Monday, June 26, 2006 when Pruitt arrived. He woke up around 4:30 a.m. to find her there, acting "real weird." He did not know if she was high or terrified. She had not been terrified when he had seen her on

10

Saturday. Pruitt seemed very upset, sitting on the floor rocking back and forth, and she started talking about the murder. She told Bert she "went to the bathroom and when she come [sic] out [Defendant] had a knife in his hand," but Bert did not believe her. Bert told her not to implicate him or his father in the murder, and threw the telephone to her to call the police, which she did. Marsh was already awake at the time; Bert did not wake him.

When Pruitt called the police, Bert left so that he would not be arrested for the parole violation for which he was wanted. Bert was serving a sentence for simple burglary and unauthorized use of an access card at the time of his testimony. He was also convicted of felony theft in 1999.

*Testimony of Defendant*

Defendant took the stand at trial. He testified he and Schermerhorn were best friends and had known each other about twenty-five years and saw each other every day when Defendant was not working offshore. Defendant often helped Schermerhorn around his house. Defendant called Schermerhorn "Gilbert"; he left a note at Schermerhorn's house on June 22, 2006, when he came home from an offshore job that read, "Say Gilbert I'm at home until the 1st of July." Schermerhorn called Defendant that evening, and Defendant went to Schermerhorn's house, where the two made gumbo, visited, and watched television until around midnight. Defendant is 5'10" tall and weighs two hundred and twenty pounds.

Around 8:00 a.m. on Friday, June 23, 2006, Defendant called Schermerhorn, who asked him to pick up Pruitt on Defendant's way home from Leesville, where he went to see his parole officer. Defendant was convicted of theft in 1996, and of theft, forgery and unauthorized use of a movable in 2004. Defendant's mother took him to

11

Leesville, and then they stopped at Marsh's home to get Pruitt, who did not know Defendant was coming to get her. Defendant did not know Pruitt, but had seen her at Marsh's house a couple of times. He had asked his mother to drive him to Marsh's house, but he did not tell her they were going to get Pruitt until they arrived at Marsh's house. Defendant told Pruitt that Schermerhorn wanted to see her, and she left Marsh's home to go to Schermerhorn's house. Along the way, they stopped at Speedy Bee's to buy beer and cigarettes. When they arrived at Schermerhorn's house, Defendant and Pruitt got out of the car, and Defendant's mother left. Defendant had no further contact with his mother until Sunday morning.

Pruitt and Schermerhorn went into Schermerhorn's bedroom. Defendant could not hear their conversation, but he believed it was about money Schermerhorn and someone else owed Pruitt; she wanted him to pay.[6] Defendant heard raised voices coming from the bedroom during the conversation. At Schermerhorn's request, Defendant took his car to the store and purchased more beer and cigarettes; he was gone about thirty minutes. When he returned, Schermerhorn was sitting on the couch, and Pruitt was sitting in a chair at the end of the couch. Defendant and Schermerhorn talked of purchasing land at Toledo Bend, something they had discussed for a while.

Schermerhorn asked Defendant to try to connect a satellite receiver in his bedroom. Defendant and Schermerhorn went to the bedroom, then returned to the living room to look behind the television. Pruitt was not in the living room when they returned; Defendant thought she was in the bathroom. Schermerhorn stood right behind Defendant. As Defendant slid the television back against the wall, he heard Schermerhorn trying to say his name. Schermerhorn started to go down on his knees,

---

[6]At another point in his testimony, Defendant said he did not know the subject of the argument.

12

kneeling at the end of the coffee table. Defendant saw blood on his lips. Pruitt was at the end of the coffee table toward the kitchen. Defendant went to Schermerhorn to see what was wrong; he "was trying to breath[e] and just – didn't sound good." When Schermerhorn leaned over the coffee table, Defendant picked him up by the belt loops on his shorts and tried to put him on the coffee table, all without getting any blood on him. Prior to the noises Schermerhorn made, Defendant heard nothing unusual in the small living room where the three of them were.

Defendant asked Pruitt to call 911, but she began to stab Schermerhorn again. Defendant dropped Schermerhorn on the coffee table while Pruitt continued to stab him, and "like a coward [he] went and got in [Schermerhorn's] bedroom closet." He sat on the floor in Schermerhorn's closet for about ten minutes that "seemed like hours." Pruitt came to the closet door with a shotgun, and Defendant asked if she was going to shoot him. The shotgun had been located near the end of the couch in the living room; Defendant said Schermerhorn "kept his gun close to him." Pruitt never threatened Defendant with the shotgun, and never said she would shoot him, but she had the shotgun in her hand. She told him they were going to her brother's house and "he was going to make it right." Defendant went with her without checking on Schermerhorn; in Defendant's words, "[he] didn't do nothing." Pruitt had a trash bag with something in it when she left Schermerhorn's house; they took it with them, along with the shotgun.

When asked why he did not call 911, Defendant responded, "I, I don't know. To this day, I still don't know." Pruitt carried the shotgun and the trash bag when they left Schermerhorn's house. A .22 rifle was already in Schermerhorn's car. Pruitt drove Schermerhorn's car to Speedy Bee's; she went inside and bought beer, ice, and

an ice chest while Defendant stayed in the car. Only a very short time after the murder, Defendant did nothing and said nothing to anyone about it, and he could not answer why. Defendant and Pruitt then traveled to Texas Street, where Pruitt purchased crack from a girl for two hundred dollars. Around dark, they went to Bolgiano's house.

When they arrived, Pruitt took the ice chest and beer inside and set down the trash bag before going into the bedroom with Bolgiano for about fifteen minutes. Defendant sat in the living room the entire time, and could not explain why he did not leave. When Pruitt returned, she opened a beer and put the contents of the bag – "some hamburgers and some Hot Pockets and stuff she had took [sic] from [Schermerhorn]'s house" – in the freezer.

That Friday night, Defendant got drunk; Pruitt and Bolgiano drank a lot, but "didn't get as drunk as [he] did." When Defendant went to bed around 2:30 or 3:00 in the morning, Pruitt and Bolgiano were still drinking beer and smoking crack. Defendant also smoked crack for the first time. He never gave any thought about what he was going to do about the murder.

The next morning, Pruitt and Defendant left Bolgiano's home in Schermerhorn's car to go to the "Crossings" area to purchase more drugs. They met someone called "Dirt"; Pruitt was going to trade each of Schermerhorn's guns for a twenty-dollar rock of crack. Defendant stopped the deal because the guns "were [Schermerhorn]'s grandpa's guns." He, Pruitt, and Dirt went to the Head South pawn shop to pawn the guns, but the shop had just opened and had no money. They then went to EZ Pawn, where Defendant produced identifying documentation and signed the pawn ticket. He received $89 in the transaction. Defendant said nothing to the

14

pawn shop employee or anyone else about the murder, and he has no idea why he did not.

The trio then returned to the "Crossings" area, dropped off Dirt and met with Eric Williams, known as "Little E." All three used drugs in the car while returning to Bolgiano's house. Along the way, Pruitt "just started getting weird and talking to herself," and Williams began to drive. Pruitt and Williams made a deal for Williams to use Schermerhorn's car for an hour in exchange for fifty dollars worth of crack. They returned to Bolgiano's house around noon on Saturday, June 24, 2006.

About an hour later, Williams returned to Bolgiano's house. He gave Pruitt more crack in order to use the car for another hour. Williams left, and a few hours later, Bert arrived with Louis Owers. Williams ultimately returned again that night and gave Pruitt more drugs for use of the car. Defendant never saw the car again after that, and he did not know where it was.

Pruitt's shirt had two small spots of blood about the size of a pea on it when they left Schermerhorn's house, and when she wore it into Speedy Bee's a short time after the murder. On either Saturday morning or Saturday evening, she built a fire in Bolgiano's back yard and burned her clothes. Defendant was at the fire with Pruitt. Throughout that Saturday night, the people at Bolgiano's house drank and used drugs. Defendant left with Louis Owers and Robert Marsh;[7] they went to get money from an ATM. Throughout the time Defendant, Bert and Owers were together, Defendant said nothing of Schermerhorn's murder, and he made no effort to avoid going back

_____

[7]The record is not clear whether Defendant was referring to Robert Marsh, Sr. or Robert "Bert" Marsh, Jr. However, the context and the testimony of other witnesses suggests Defendant meant Bert Marsh.

15

to Bolgiano's house. Pruitt then called someone to bring more drugs. The night was steady with drug use and partying, and no one slept.

On Sunday morning, Defendant called his mother and asked her to come get him. He could not explain where they were, so he asked her to go to Leebo's on Highway 28, where Bolgiano said he would take Defendant. Defendant and Pruitt met Ms. Sumrall around 12:30 or 1:00 p.m. Defendant asked Ms. Sumrall to take him to Fort Polk to get a beer because he had a hangover. At Fort Polk, they left Pruitt at a store outside the post because she had no identification. They purchased gas and beer at Fort Polk and returned to get Pruitt. After they left Fort Polk, Defendant told his mother he wanted to go to the hospital because he "really thought [he] was going nuts." Defendant then drove them toward Pineville. He never told his mother he killed Schermerhorn, and Ms. Sumrall knew nothing of the murder.

Defendant checked himself into the hospital, saying he needed to talk to a doctor in the psychiatric ward. He thought he had depression and was "just going crazy." He did not see his mother or Pruitt anymore that day.

Defendant's sworn testimony was that he did not kill Schermerhorn; "Tina [Pruitt] did." He was present when Schermerhorn died. He had no explanation for why he said nothing to anyone about the murder when he had multiple opportunities to do so; when asked why, he consistently responded, "I don't know."

*Testimony of other witnesses*

Sheriff's Deputy Keith James was the dispatcher on duty who received Pruitt's call around 3:30 to 4:00 a.m. on June 26, 2006 Pruitt sounded "real nervous," and said she witnessed a homicide on Marlowe Road when Defendant killed Schermerhorn. She told Deputy James she was "afraid for her life possibly."

16

Patrol Officer Jerry Twyman took the telephone from Deputy James, and Pruitt told him Defendant had killed Schermerhorn. Officer Twyman contacted Deputy Tommy Pollard, and they went to Schermerhorn's residence around 4:00 a.m. They saw a blue light coming from inside the trailer that appeared to come from a television, but no one responded when they knocked on the door. When Deputy Pollard opened the door, two of the dogs in the yard ran inside and prevented the officers from entering the trailer, but Officer Twyman was able to see a body lying on the floor.

After an animal control warden was contacted and removed the dogs from the trailer, Chief Detective Marvin Hilton, Detective Ronald Wiggins, and Detective Yates went to the scene. The detectives entered the trailer around 6:35 a.m. and found Schermerhorn's body face down to the left of the door, partially on the floor and partially on a coffee table that apparently broke when he fell on it. They saw six puncture wounds on Schermerhorn's left back and one on his right back. They turned the body and discovered another puncture wound to the left chest that had bled a great deal more than the others. Detective Hilton saw no blood on the kitchen floor, but he found a butcher knife in the sink wrapped in cloth.[8]

During Detective Wiggins' interview of Pruitt, he learned of Defendant's whereabouts, and asked Detectives Pollock and Kennedy to go to Huey P. Long Hospital around 7:00 a.m. They found Defendant there and brought him to the sheriff's office.

Just after 9:55 a.m., Detective Hilton received a call that Schermerhorn's vehicle had been found at 1007 N. Ermine Street. He went from that location to

---

[8]This murder weapon was a long-bladed knife, but neither this knife nor any other was ever identified.

Bolgiano's house around 11:00 a.m. to look for burned areas in the yard. In the front yard, he recovered some cloth-like material, and he found other potential evidence in the backyard. Lab reports, however, could not identify the burned items. Detective Hilton had Bolgiano view a photo lineup, and he identified Defendant as the person who was in his residence that weekend.

The trial began on May 4, 2009, and went to the jury on May 8, 2009. More than three hours after the jury began its deliberations, it sent a note to the court stating, "as of now, we cannot deceide [sic] NOW WHAT?" Questioning of the foreman by the trial court revealed the group was close to having the ten votes required for a verdict, without revealing whether the majority favored conviction or a not guilty or responsive verdict. The trial court instructed the jury to continue its deliberations. Defense counsel objected on grounds that the trial court's instructions "border[ed] on being coerced," that the jury's question "kind of sends an occasion that there [sic] are almost hopelessly deadlocked." He was concerned that the jury would think "they really want us to get this over with," so those who were "holding out" would just "bail" to end it.

The jury returned at 7:58 p.m. with a verdict of guilty. Polling of the jury revealed ten "yes" votes and two "no" votes to convict. The court imposed the mandatory life sentence without benefit of probation, parole, or suspension on May 18, 2009.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record we find there are no errors patent.

18

## ASSIGNMENT OF ERROR NO. 1

Defendant contends the jury verdict that convicted him of the second degree murder of Schermerhorn fails to meet the legal standard of sufficiency of the evidence. He argues no physical evidence linked him to the murder, but he admits he was present when it occurred. Because Pruitt's testimony is inconsistent and unreliable, Defendant argues, the evidence was insufficient to support his conviction.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007), *citing Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). The essential elements of the crime of second degree murder are the killing of a human being with the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1.

The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521; *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165. The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the

19

sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270; *State v. Turner*, 04-1250 (La.App. 3 Cir. 3/2/05), 896 So.2d 286, *writ denied*, 05-871 (La. 12/12/05), 917 So.2d 1084. Indeed, a witness's credibility is "a matter of the weight of the evidence, not subject to appellate review." *State v. Strother*, 09-110, p. 15 (La.App. 3 Cir. 10/7/09), 19 So.3d 598, 607-08.

This case presents a finite number of possibilities of how the murder occurred. Either Defendant or Pruitt, or both of them, murdered Schermerhorn. Defendant says Pruitt did it; Pruitt says Defendant did it. The jury evaluated lengthy and detailed testimony from both of them. It believed Pruitt; it did not believe Defendant. We will not interfere with the jury's credibility determination unless the testimony Pruitt gave would be insufficient to convict Defendant.

Assuming Pruitt's testimony to be true, the evidence is sufficient to support Defendant's conviction. Although she was not in the room when Schermerhorn was first stabbed, Pruitt returned to the room very shortly thereafter and found Defendant holding a knife. Defendant told her he had just killed his best friend, and he told Pruitt to leave the room while he stabbed Schermerhorn again. The autopsy showed Schermerhorn sustained eight wounds, up to seven-and-a-half inches deep, inflicted with enough force to pierce cartilage and bone and puncture his lungs.

Additionally, the jury could have reasonably disbelieved Defendant's testimony. Defendant said he was never afraid of Pruitt, even though she killed his friend without provocation, and she pointed a shotgun at him. Defendant passed up opportunity after opportunity to report the crime before Pruitt reported it two-and-a-

20

half days later. In fact, Defendant *never* reported that Pruitt, with whom he had no relationship, had murdered his best friend. And, from the Friday of the murder until Sunday afternoon, he chose to stay with Pruitt, a woman he did not know and had only seen a couple of times previously. His response to why he behaved as he did was simply, "I don't know."

Defendant offered some evidence to support his argument that Pruitt killed Schermerhorn. However, the jury's verdict of guilty indicates a rejection of his claim of innocence. Given the evidence in the record, the jury's rejection was reasonable, as was its verdict of guilty.

## ASSIGNMENT OF ERROR NO. 2

Defendant argues the trial court erred by restricting his cross-examination of Pruitt in violation of the Fourteenth Amendment and the Confrontation Clause, and that the trial court further erred by refusing to allow a proffer of evidence he sought to introduce. Specifically, Defendant wanted to introduce evidence of Pruitt's post-murder drug usage and the "deal" she received in this case as the State's witness in order to place her credibility in doubt. The trial court held that potential testimony was inadmissible because it was "too unrelated – to [sic] far in time."

The courtroom debate began after defense counsel questioned Pruitt about prior convictions for drug possession. During the resulting sidebar conference, counsel indicated his intention to question Pruitt about drug charges filed against her after the murder, but unrelated to it. The trial court repeatedly advised defense counsel that he could ask about convictions, but none of the facts leading up to the convictions. Defense counsel felt evidence of Pruitt's post-murder drug charges impacted her credibility, and her drug use affected her ability to recall the events of the murder.

21

Other evidence Defendant sought to admit concerned Pruitt's alleged five to six hundred drug purchases from an individual. Defendant argued the evidence somehow impacted Pruitt's credibility; in his brief, he argues that evidence was "relevant to her motives and reliability as a witness" and affected "her credibility and her ability to remember things." The trial court found that evidence far beyond Pruitt's possible criminal activity related to this case, and disallowed its admission.

Counsel also suggested Pruitt's accusatory testimony against Defendant was prompted by a "deal" she made with the State regarding those post-murder charges. Introducing evidence of the charges, he argued, would show Pruitt's motive to lie.

In fact, evidence of those charges was ultimately introduced by the State, not by Defendant. After the sidebar conference in which the trial court agreed that defense counsel could question Pruitt about her post-murder conviction, counsel failed to ask those questions, asking instead only whether Pruitt herself committed the murder. When the State recalled Pruitt, she testified she was charged, in an unrelated case, with conspiracy to possess cocaine and possession of marijuana. She explained the conspiracy charge was dropped, and she pled guilty to first offense possession of marijuana. Her plea had nothing to do with the murder case or her testimony in it.

Defendant's brief suggests drug charges were dropped and/or minimized in exchange for Pruitt's testimony, and this "deal" led to her release thirty-five days after her arrest on June 26, 2006. The record, however, does not support this theory. Indeed, on cross-examination, defense counsel himself pointed out that the date of Pruitt's drug *offense* – not her plea – was in October of 2007, more than a year after the murder, and more than a year after she was released from jail without being charged with anything related to the murder. Thus, her purported desire to avoid

22

serious drug charges could not have been satisfied by any plea she would have made in exchange for testimony, when the drug offenses to which she pled had not yet been committed at the time of her release from jail.

Only relevant evidence, that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," is admissible at a trial. La.Code Evid. arts. 401, 402. Here, evidence of charges not leading to convictions does not help the jury determine the probability that any fact is true or false. Evidence of Pruitt's drug charges so temporally removed from and unrelated to the murder is not relevant to Defendant's guilt or innocence. Likewise, how many hundreds of times she may have purchased drugs from someone does not help determine any fact pertinent to the murder. And, regarding her plea agreement relative to post-murder drug charges, defense counsel himself showed that evidence provided no motive for Pruitt to lie, because the offenses which led to the plea occurred long after Pruitt's release from jail with regard to this murder. Accordingly, the trial court did not err in disallowing the introduction of this evidence at trial.

Further, we find the trial court's alleged error in disallowing a proffer of evidence likewise has no bearing on the outcome of the trial. If indeed the trial court erred, that error is of no moment because the very evidence of which Defendant complains was ultimately revealed to the jury through questions posed by the State. This assignment of error has no merit.

**ASSIGNMENT OF ERROR NO. 3**

Defendant argues, particularly in light of what he considers to be a "modified *Allen* charge," that the non-unanimous guilty verdict violates federal and state

23

constitutions. He acknowledges this court's decision in *State v. Juniors*, 05-649 (La.App. 3 Cir. 12/30/05), 918 So.2d 1137, *writ denied*, 06-267 (La. 9/15/06), 936 So.2d 1257, *cert. denied*, 549 U.S. 1226, 127 S.Ct. 1293 (2007), but urges this court to reconsider the issue.

*Juniors* contains a thorough discussion of this issue, and explains that La.Code Crim.P. art. 782(A), requiring at least ten jurors to concur in a verdict in a case "in which punishment is necessarily confinement at hard labor" is not unconstitutional. Relying on *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972) and *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620 (1972), this court agreed that unanimity is not constitutionally required.

Defendant argues *Apodaca* is "a brief departure" from the principle that the Sixth and Seventh Amendments of the United States Constitution require unanimous verdicts, citing *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215 (1999); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000); and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002). This court in *Juniors* noted that each of those cases on which the defendant relied "concern what issues must be decided by a jury," not the issue of the constitutionality of non-unanimous verdicts, as does *Apodaca*.[9] *Juniors*, 918 So.2d at 1148.

Defendant has not distinguished his case from *Juniors* or shown any reason this court should deviate from its opinion in that case. Accordingly, we choose to maintain the *Juniors* rationale, and to reject this assignment of error.

---

[9]Defendant here relies on the same cases.

24

**ASSIGNMENT OF ERROR NO. 4**

In his fourth assignment of error, Defendant contends the trial court erred when it instructed the jury to continue its deliberations, and objects to that instruction as a "modified *Allen* charge." This court explained an *Allen* charge in *State v. Gauthier*, 04-1608 (La.App. 3 Cir. 11/2/05), 916 So.2d 314, *writ denied*, 06-465 (La. 9/22/06), 937 So.2d 378, quoting *State v. James*, 96-472, pp. 3-4 (La.App. 3 Cir. 12/11/96), 687 So.2d 485, 487, *writ denied*, 97-69 (La. 5/16/97), 693 So.2d 796:

> In [*State v.*] *Nicholson*, 315 So.2d 639 [ (La.1975) ], the supreme court set limits to the instructions that a trial judge can give to a jury after the jury announces it cannot reach a verdict. In *Nicholson*, the court held when a trial court gives a deadlocked jury an instruction that rises to the level of being an "*Allen* charge" or any "coercive modification" of an *Allen* charge, the trial court has committed reversible error. The *Allen* charge originated in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the United States Supreme Court approved a charge designed to break a jury deadlock and accomplish jury unanimity. One characteristic of an *Allen* charge is an admonition to the jurors in the minority to reconsider their opinion in favor of the majority in order to reach a decision. *State v. Schamburge*, 344 So.2d 997 (La.1977); *State v. Washington*, 93-2221 (La.App. 1 Cir. 11/10/94); 646 So.2d 448; *State v. Caston*, 561 So.2d 941 (La.App. 2 Cir.1990); *State v. Campbell*, 606 So.2d 38 (La.App. 4 Cir.1992). A second characteristic is the trial court implying to the jury that it must reach a decision because the trial court will not accept a mistrial. *Id.*
>
> The Louisiana Supreme Court has banned the use of *Allen* charges and "modified" *Allen* charges to ensure that juror verdicts are not the product of coercion. *Schamburge*, 344 So.2d 997; *Nicholson*, 315 So.2d 639. "When the duty to reach a verdict is coupled with the trial court's admonition that those in the minority should reconsider their position, there exists an almost overwhelming pressure to conform to the majority's view." *Washington*, 646 So.2d at 454-455.

*Gauthier*, 916 So.2d at 321.

In *Gauthier*, the jury submitted a question about its options and implied it may have been at an impasse. The trial court instructed the jury that he would send them back to deliberate for an additional thirty minutes, and it urged the jury members to

"come to some kind of agreement." *Id.* The trial court encouraged them not to surrender their individual opinions, but to consider the other jurors' views and weigh them against their own. This court held counsel was not ineffective for failing to object to this charge, as it "was not an *Allen* charge." *Id.* at 322.

Similarly, the trial court ordered the jury to return to deliberation and return a verdict when the jury informed the court it could not reach the required vote after slightly more than an hour of deliberations in *State v. Anders*, 06-589 (La.App. 3 Cir. 9/27/06), 941 So.2d 93. This court held the court's comments "merely indicate it felt it was much too soon in deliberations for the jury to conclude that it could not reach a verdict." *Id.* at 101-02.

Here, the jury sent a note to the trial court asking, "as of now, we cannot deceide [sic] NOW WHAT?" The trial judge called the jury to the courtroom, and this exchange occurred:

BY THE COURT:

Let me ask you this. Without giving me the numbers at this point, are you close to, to the ten one way or the other – the ten you need to reach a verdict?

BY [THE FOREMAN]:

Yes, sir.

BY THE COURT:

All right, sir. So, it – it's not at least at this point an evenly split division that – there's, there's – it's close one way or the other. Is that correct?

BY [THE FOREMAN]:

Yes, sir.

BY THE COURT:

All right. All right, well, we've been at this for three hours and a little over. I'm going to do this and this is just my call. I've explained to you in the charge the duty to deliberate towards a verdict, and what each of you should do about considering your own positions and talking about it and, and thinking it through and determining just exactly where you stand. I'm going to instruct that you go back into there now and deliberate some more. Now, I'm not going to give you a time frame. I'm not allowed to tell you how long I intend to keep you here or anything of that kind. But, based on what you told me, if you are close to one, one verdict – to a verdict one side or the other – one way or the other, I'm going to ask you to go back and continue your deliberations – continue to talk among yourselves and see if there's any, any movement or any change and, and give it a little more effort and a little more time . . . [I]t is your duty to deliberate and try to reach a verdict if, if you can without doing harm to your own position and conscious [sic] and so forth as I've said. But, I'm going to ask you to give it a little more time and try a little more if you would please.

The trial court never admonished the jurors in the minority to reconsider their position. He never determined which way the deliberations leaned, only that they were close to the required number for a verdict. He encouraged the jurors to consider and think through their positions, to discuss those positions, and to try to reach a verdict without doing harm to their positions. These words of encouragement do not equate with an admonition to the minority jurors to reconsider their views in favor of the majority.

Further, the trial court did not imply the jury must reach a verdict because he would not accept a mistrial. He specifically would not give the jury a time frame to come up with a verdict. He never mentioned the consequences of not reaching a verdict. He merely asked them to spend a little more time on their deliberation and to try harder. This is not a modified *Allen* charge, and thus, this assignment of error is without merit.

27

# ASSIGNMENT OF ERROR NO. 5

Defendant argues he should be granted a new trial because the trial court erroneously denied his motion in limine, allowing evidence of other crimes committed by Defendant, where the State did not file a pre-trial *Prieur* notice. The State contends the evidence admitted was part of the *res gestae*, and therefore, was not subject to *Prieur* notice.

During opening statements, the State mentioned that Defendant and Pruitt left Schermerhorn's residence after the murder in his vehicle with some of his property. Defendant objected on grounds the comments alluded to evidence of other crimes that were inadmissible at his second degree murder trial. Defendant then filed a motion in limine to prevent the introduction of evidence relating to the perceived other crimes.

The trial court denied that motion with regard to the items taken from Schermerhorn's house. The trial court believed Defendant had reasonable notice through discovery responses that the State intended to use the evidence.

Louisiana Code of Evidence Article 404(B)(1) states:

> . . . [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Thus, when evidence of other crimes is "admissible for other purposes," such as those shown in the first part of this article, the State must provide reasonable pre-trial notice of its intent to introduce the evidence at trial. However, the article deals

28

with a second instance where evidence of other crimes is admissible – "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding" – and this use of other crimes evidence does not require pre-trial notice to the defendant. We find that the second scenario is present here, and therefore, pre-trial *Prieur* notice was not necessary. Therefore, the issue is whether the other crimes evidence is an integral part of Schermerhorn's murder.

The Louisiana Supreme Court discussed the admissibility of other crime evidence when it relates to conduct formerly known as *res gestae* in *State v. Taylor*, 01-1638, pp. 10-12 (La. 1/14/03), 838 So.2d 729, 741-43, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036 (2004):

> Generally, courts may not admit evidence of other crimes to show defendant is a man of bad character who has acted in conformity with his bad character. However, under La. C.E. art. 404(B)(1) evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as *res gestae*, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." *Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence "to insure that 'the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.' " *State v. Colomb*, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting *State v. Haarala*, 398 So.2d 1093, 1098 (La.1981)). The *res gestae* doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. *State v. Huizar*, 414 So.2d 741, 748 (La.1982); *State v. Kimble*, 407 So.2d 693, 698 (La.1981). In addition, as this court recently observed, integral act (*res gestae*) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its "narrative momentum and cohesiveness, 'with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an

honest verdict.' " *Colomb*, 747 So.2d at 1076 (quoting *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

The *res gestae* doctrine in Louisiana is broad; it includes the testimony of witnesses "pertaining to what they heard or observed before, during, or after the commission of the crime, if the continuous chain of events is evident under the circumstances." *State v. Williams*, 614 So.2d 252, 254 (La.App. 3 Cir. 1993). Pruitt's trial testimony was that she observed Defendant leave Schermerhorn's house with Schermerhorn's keys, wallet, and guns within minutes of the murder. These acts, when combined with the murder, form "a continuous chain of events." Stated differently, this testimony "helps to complete the story of the crime." The other crimes evidence allows the jury to infer and conclude as necessary to reach an honest verdict. The trial court properly denied Defendant's motion in limine and properly found the filing of a pre-trial *Prieur* notice unnecessary.

## CONCLUSION

Each of Defendant's assignments of error is without merit. The jury chose between contradictory versions of how the murder occurred by making credibility assessments; it believed Pruitt's testimony that Defendant killed Schermerhorn. This court may not substitute another factual conclusion for the jury's determination. *Pigford*, 922 So.2d 517. Pruitt's testimony was not unconstitutionally limited. The evidence Defendant sought to proffer was in fact presented by the State, such that any purported error concerning the proffer was harmless. This court has previously held that a non-unanimous verdict is not unconstitutional. *Juniors*, 918 So.2d 1137. The trial court did not present an *Allen* charge to the jury that encouraged the minority members of the jury to surrender their position or threatened a mistrial in absence of

an imminent verdict. Finally, the other crimes evidence presented by the state was part of a continuous chain of events intertwined with the murder itself.

## DECREE

Defendant's conviction for second degree murder is affirmed.

**AFFIRMED.**