# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**13-305**


**STATE OF LOUISIANA**

**VERSUS**

**KENDRICK M. COX**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C15782
HONORABLE ERIC ROGER HARRINGTON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and John E. Conery, Judges.


**AFFIRMED.**

**Brent A. Hawkins**
**Louisiana Appellate Project**
**Post Office Box 3752**
**Lake Charles, Louisiana 70602**
**(337) 502-5146**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Kendrick M. Cox**

**Van Hardin Kyzar**
**District Attorney**
**10th Judicial District Court**
**Post Office Box 838**
**Natchitoches, Louisiana 71458-0838**
**(318) 357-2214**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**State of Louisiana**

**Charles Wilson Seaman**
**Attorney at Law**
**Post Office Box 835**
**Natchitoches, Louisiana 71458-0835**
**(318) 352-7821**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**State of Louisiana**

**CONERY, Judge.**

Defendant, Kendrick M. Cox, was charged on September 11, 2009, via a bill of information with one count of armed robbery and armed robbery with use of a firearm, violations of La.R.S. 14:64 and 14:64.3, and one count of second degree battery, a violation of La.R.S. 14:34.1. A jury trial commenced on January 18, 2011. On January 19, 2011, Defendant was convicted of armed robbery and second degree battery.

Defendant was sentenced on March 18, 2011, to the minimum sentence of ten years at hard labor without benefit of probation, parole, or suspension of sentence on the conviction for armed robbery and three years at hard labor on the conviction for second degree battery, to be served consecutively with the ten year sentence and with credit for time served. Defendant did not orally move for or file a motion for reconsideration of the sentences.

Defendant was granted an out-of-time appeal. He asserts that the evidence was insufficient to establish that he was the man who committed the offenses of armed robbery and second degree battery. For the following reasons, we affirm his convictions.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, there are no errors patent.

## STANDARD OF REVIEW

In *State v. Dotson*, 04-1414, pp. 1-2 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312, this court has explained the insufficiency analysis as follows:

> In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La.4/3/02), 815 So.2d 50.

*State v. Chesson,* 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied*, 03-2913 (La.2/13/04), 867 So.2d 686.

Further, when the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright,* 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.

Furthermore, included with proving the elements of an offense is the necessity of proving the identity of the offender. When the key issue in a case is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. McGee*, 04-963 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, *writ denied*, 05-593 (La. 5/20/05), 902 So.2d 1050.

## ASSIGNMENTS OF ERROR

ASSIGNMENT OF ERROR NO. 1: Kendrick's fundamental right to a fair trial was violated [because] the victim, the only witness, never identified him as the assailant at trial. Kendrick's trial counsel was ineffective for failing to seek a directed verdict and failing to file for a judgment notwithstanding the verdict after [trial] because the victim never identified Kendrick at trial.

ASSIGNMENT OF ERROR NO. 2: The evidence was insufficient to convict the [sic] Kendrick of armed robbery or second-degree battery

2

because evidence beyond a reasonable doubt was not presented at trial [to prove that] Kendrick was the assailant who committed the offenses.

Both assignments of error will be addressed together as Defendant's primary complaint in both is that he was never adequately identified by the victim, Ms. Velma Berryman, as the man who robbed and battered her. The victim gave a statement to police that the robber's face was covered, and she could only see his eyes. Later, after she recovered from the incident, she told the police that she recognized Defendant as the robber by his voice. Defendant complains there was never a "voice line-up." Furthermore, Defendant asserts that while the victim testified he was the man who robbed her, she never identified him by his voice at trial.

Defendant further argues that the testimonies of several persons who saw him walking in the same neighborhood as the convenience store wearing clothing very similar to the clothing the victim said the robber wore were not credible or sufficient to establish beyond a reasonable doubt that he was the offender.

Finally, Defendant asserts ineffective assistance of counsel for failure to ask for a directed verdict or for failing to file a motion for judgment notwithstanding the verdict based on the above allegations.

## FACTS

At trial, Ms. Berryman testified that she was the owner and sole operator of Ms. B's Quick Stop (Ms. B's). The shop is located in Natchitoches, Louisiana, in an area known as the Payne subdivision. Ms. Berryman testified she was familiar with the streets behind her store, which were Payne, Keith, Mary, and Cherie Loop.

3

On the morning of August 1, 2009, Ms. Berryman opened the store early. At approximately 10:00 a.m., as she was stocking shelves, she suddenly noticed a person standing in front of the TV. The person was wearing a heavy, black coat with a dark fur trimmed hood. She remembered wondering who would be wearing such a heavy garment on such a hot day. When the person turned towards her, she saw that he had a bandana across his face. The hood was pulled low over his forehead and all she could see were his eyes. The man had a gun and told her he would blow her brains out. He told her to open the cash drawer. She told him if he wanted the cash drawer open he could do it himself. Ms. Berryman attempted to grab a gun she kept under the counter, but Defendant wrestled it out of her hand. Ms. Berryman was then struck on the head with a gun. During the scuffle, her arm and a leg were injured and a stone was knocked out of her ring. According to Ms. Berryman, after being struck with a gun, her head struck the counter as she was knocked to the floor. Ms. Berryman stated Defendant stole about $150.00 and her gun.

Ms. Berryman explained that when the officers first arrived at the scene, she was unable to identify Defendant, as she was disoriented and upset due to Defendant's striking her head with a gun, and further due to her hitting her head on the counter when she was knocked to the floor. The next day, after recovering from the initial shock of the assault, Ms. Berryman told the police she knew who Defendant was, as she was familiar with and recognized his voice. Ms. Berryman explained she knew Defendant's voice because he was a frequent customer of the store. Defendant admitted in the recorded statement on August 6, 2009, that he had worked for Ms. Berryman, cutting the grass behind the store with another individual. In addition, he admitted that he had obtained "credit" from the store.

4

Further, Defendant admitted that he came into the store a few minutes before the incident to purchase cigarettes. Ms. Berryman testified that it was Defendant who had robbed and battered her. She identified him as her assailant in court and testified at trial, "But I thought about it. I had just talked to the man. And the voice, it came back to me that was the same voice I had just heard."

Michael Wilson, Assistant Chief Investigator for the Natchitoches Parish Sheriff's Office, testified at trial that he arrived on the scene shortly after the police were notified. Based on the description given by Ms. Berryman of a person wearing a heavy winter coat with a hood, he sent officers out into the Payne neighborhood to canvas for potential witnesses. He also sent out police tracking dogs.

The tracking dogs wound through the Payne neighborhood and ultimately alerted on a pair of tennis shoes located on property where Defendant lived with his mother. Defendant's mother identified the shoes as those belonging to Defendant. Officer Wilson testified that DNA testing verified that the DNA taken from the shoes established they belonged to Defendant.

Michelle Vrana, a forensic DNA expert, testified at trial that Defendant could not be excluded as the major contributor of the DNA located in the shoes. Ms. Vrana further testified that the DNA extracted from the stone lost from Ms. Berryman's ring during the struggle, which was found by investigators at the scene, did not contain any DNA consistent with Defendant's DNA.

The canvas of the Payne neighborhood produced a number of witnesses who gave statements and ultimately testified at trial about their encounters with Defendant on the day of the incident. Officer Wilson testified that he interviewed David Bradley, who said he saw Defendant the morning of the incident in the

5

Payne subdivision wearing a black, heavy winter coat with a hood. Mr. Bradley gave Officer Wilson a few names of others in the neighborhood who had also seen Defendant the morning of the incident.

Prior to conducting interviews with those witnesses, Officer Wilson brought Defendant into the police station and interviewed him. Defendant denied any involvement in the robbery.

Officer Wilson then began a series of interviews with the individuals identified by Mr. Bradley. These individuals included Rodney Goston and Tyrone Demery. Each witness testified that they encountered Defendant around 10:00 a.m., while they were together on Mary Street. The witnesses knew Defendant from the neighborhood, and each testified they saw him on the morning of the incident wearing a heavy black coat with the hood up. However, when Defendant stopped to talk to them later in the day, the hood was down. The men were amazed that Defendant was wearing such a heavy coat in spite of the August morning heat. When they questioned Defendant about wearing such a heavy coat in the heat, they got no response. In addition, the men noticed that Defendant had blood on one of his hands. Defendant told the three men that as he was walking through a small wooded area located behind Ms. Berryman's store, he was attacked by two deer. As he ran from the deer, he fell and cut his hand. Each of the three men also testified that they had never heard of deer being in that area.

Willie Easily also testified that Defendant stopped by his house for five to ten minutes on the morning of the incident. Mr. Easily stated that Defendant was wearing a heavy jacket with the hood up. Some twenty minutes later Defendant returned wearing only jeans, without a coat or shirt. Mr. Easily noticed a cut on

Defendant's finger and Defendant explained that he "ran into some deer up in a trail or something like that." [sic]

Another neighborhood resident, Gary Braxton, testified at trial that he saw Defendant on the morning of the incident walking along the street. Defendant appeared to be counting money. According to Mr. Braxton, Defendant was bare chested.

DeMaurice Moore, a neighbor who was friends with Defendant, told the police that on the night of the incident, he and Defendant went out together. Mr. Moore said Defendant bought two bottles of whiskey and paid for tickets so that both could attend a concert at the local civic center. Mr. Moore later testified that Defendant had won money gambling the night before.

Based on the information gathered from the individuals in the neighborhood near Ms. B's, Officer Wilson brought Defendant into the police station a second time, *Mirandized*, and interviewed him. The interview was taped, transcribed, and submitted into the record at trial. Defendant stated that on the morning of August 1, 2009, he got up about 6:30 or 7:00 a.m. He dressed in a white T-shirt, black shorts, and tennis shoes. He went to Ms. Berryman's store, bought some cigarettes, and walked back home. Defendant claimed he did not see or talk to anyone other than Ms. Berryman. He stated that he left to go to a funeral around 11:30 a.m. or 12:00 p.m.

Defendant told Officer Wilson that he had gone out with DeMaurice Moore on the evening of August 1, 2009. He said that he had no money, and Mr. Moore paid for everything. Defendant further stated that he cut his hand on the morning of August 1st while styling his hair. Despite his mother's prior identification of his tennis shoes, Defendant denied that the shoes were his. When he was confronted

with the witnesses' statements taken in connection with the case, Defendant contended that they were all lying.

Defendant's testimony at trial was essentially the same as his interview, except that he stated he won about $200.00 the night before the incident playing dice. He insisted, however, that he had stashed the money at his grandmother's house the next morning, so he did not have money on the evening of the robbery. Therefore, he had no money to buy alcohol or concert tickets, as Mr. Moore claimed.

Defendant offered a picture of some bills lined up on a floor as proof that he had money on the evening before the incident. The picture shows one ten, two fives, and twenty-two one dollar bills. Defendant testified he was so excited to have won the money that he ironed the bills for the picture. Although there appear to be only $42.00 in the picture, he also testified the "[o]nes lined up . . . and they got fives and the tens under it." Defendant further testified that he did not tell Officer Wilson about the money he had won gambling because Officer Wilson had not asked about the money during the interview. A friend, Alex Pugh, testified that he was with Defendant when he won some money playing dice.

Defendant finally admitted at trial that the shoes found behind his house were his shoes, but claimed he sold the shoes a few weeks prior to the incident. Defendant explained that he told the officer the shoes did not belong to him because at the time of the questioning about the ownership of the shoes, he was unaware of what shoes Officer Wilson was referencing.

Defendant then testified to a list of all of the grievances the witnesses had against him to explain why they were lying about his actions on the morning of the incident.

**ANALYSIS**

In contesting Ms. Berryman's identification, Defendant argues that: "the record fails to reflect the only eyewitness failed to identify Kendrick by his voice at trial, the only manner by which she could identify the person who robbed her." Defendant further argues that in the initial interview with police, Ms. Berryman never identified Defendant as her assailant by his voice or by any of the physical characteristics that she could see at the time of the incident, including his eyes or the shape of his head. Defendant asserts Ms. Berryman was not offered the opportunity to participate in a voice line-up due to her age and Officer Wilson's belief that Ms. Berryman was not an expert in voice recognition.

The State argues there was no need for a voice line-up, since Ms. Berryman had already identified Defendant by his voice. We agree. In the case of photographic or physical line-ups, a victim who could not identify the offender is offered a line-up for the purpose of identifying the offender. However, if the victim knows who the assailant was and can tell the police, a line-up may very well not be necessary. In voice identification, if the victim could not see the perpetrator's face but had only heard his voice, then a voice line-up could be a useful tool to identify the suspect. *State v. Pickney*, 97-1591 (La.App. 3 Cir. 5/27/98), 714 So.2d 854, *writ denied,* 98-1857 (La. 11/13/98), 730 So.2d 457.

In *Pickney*, the victim of an aggravated rape did not know her assailant and was unable to describe his face or estimate his height and weight, but said that she would be able to recognize his voice. Accordingly, a voice recognition line-up was prepared for her. She picked out her assailant, who was tried and convicted. On appeal, Pickney complained his due process rights were violated as the voice

identification line-up was suggestive and led to a substantial likelihood of misidentification.

Pickney's conviction for aggravated rape was affirmed by a panel of this court on the basis that the identification procedures used in the voice line-up were not unduly suggestive, thus the panel did not reach the issue of a substantial likelihood of misidentification.

Defendant avers that the record does not reflect that Ms. Berryman identified him by his voice during the trial proceedings. It appears Defendant is suggesting that the State should have had Defendant stand and say a few words so that Ms. Berryman could say, "Yes, that's his voice, all right," in order to have proved its case. However, in a case with a similar fact scenario, *State v. Mitchell,* 35,970 (La.App. 2 Cir.5/8/02) 818 So.2d 807, the court held:

> Voice identification is a problem of authentication rather than a problem of a lay witness's competency to identify a voice. Sufficient authentication can be established by circumstantial evidence pointing to the unseen speaker's identity or by testimony of a witness familiar with the speaker's voice. Authentication based on familiarity with the speaker's voice can be gained subsequent to the communication. (Citations omitted.) *State v. Green*, 448 So.2d 782, (La.App. 2 Cir. 1984).

> The trial court correctly found that the state laid a sufficient foundation to support Cotty's lay opinion testimony concerning her inferences regarding the defendant's voice which were drawn from personal factual observations. Cotty testified that during the course of the robbery, she heard the defendant's voice "many, many times." Cotty stated that the defendant shopped in her store, and she had heard his voice before. Cotty explained that the defendant's mother and family shopped at the store. She said her town was "little bitty," and she spoke to just about everyone who came into the store. This argument is therefore without merit.

*Id*. at 816-17.

In *Mitchell*, a voice line-up was not required based on the foundation laid that Mitchell had been into the store many times and the voice identification was

based on the victim's "personal factual observations." Mitchell, at 816-817. In the current case, which has almost identical facts to *Mitchell,* Ms. Berryman testified that she talked to Defendant on numerous occasions, as he was often a customer in her store. On the morning of the incident, Defendant had just been in the store to purchase cigarettes. When he returned a short time later, he told her that he was going to blow her head off and demanded that she open the cash drawer.

Ms. Berryman identified him as her assailant in court and testified at trial, "But I thought about it. I had just talked to the man. And the voice, it came back to me that was the same voice I had just heard." Ms. Berryman also described the heavy black coat with a hood that Defendant wore, which was an oddity because it was such a hot August day. Defendant's contention that a voice line-up should have been conducted or that Ms. Berryman failed to identify him as her assailant at trial has no merit.

Several witnesses who knew and spoke with Defendant that morning testified that he walked up to them as they stood in the street wearing a heavy black coat with a hood. One witness testified he saw Defendant counting money as he walked along. Defendant said that he had no money with him on the evening after the robbery, yet his friend, Mr. Moore, testified Defendant paid for alcohol and concert tickets.

Defendant also submits that the DNA sample from the blue stone from Ms. Berryman's ring was not consistent with Defendant's DNA and is clearly exculpatory. The lack of Defendant's DNA on the stone lost from Ms. Berryman's ring does not exculpate Defendant. Ms. Varna testified that Ms. Berryman's DNA was also not found on the stone and it may have simply popped out when she fell.

11

In *State v. Wommack,* 00-137, p. 6 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 370, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62, this court stated:

> As stated above, the defendant's appellate counsel contends the evidence was insufficient, but does not specifically contest the evidence as a whole. Rather, counsel points to several issues he contends undercut the State's case. First, counsel contests Ms. Smith's testimony regarding identification of the assailant's voice. We have pointed out that Ms. Smith testified she immediately recognized the voice of the assailant as that of the defendant. She stated she had worked with the defendant for approximately one and one-half years and he had been friends with her husband. The defendant had visited in her home and was a guest in her van on several occasions. According to her testimony, Ms. Smith heard the assailant's voice on three separate occasions. Throughout the matter, she was unequivocal in her identification of the assailant's voice as that of the defendant.
>
> Counsel argues that "[a]s Janet Smith told Officer Kenneth Pine that she only recognized the assailant's voice as his face was covered and she could only see his eyes, there can be no earthly reason why a voice identification line-up was not conducted." Counsel asserts that such a procedure could have established the defendant's innocence. While such a tool may have been available during the investigation, there is no legal authority requiring its use. This argument is without merit.

Similarly, in the current case, we find there is no merit to the assignment of error that there was insufficient evidence to convict Defendant of the offenses charged. Between Ms. Berryman's testimony and the testimonies of the several witnesses, viewed in a light most favorable to the prosecution, the jury had sufficient evidence upon which to base the verdicts.

Finally, Defendant argues that defense counsel's performance was defective because he failed to seek a directed verdict or to file a judgment notwithstanding the verdict "because the victim never identified Kendrick by voice at trial." This court also finds there was no defective performance on defense counsel's part and no merit to this assignment of error.

## DISPOSITION

Defendant's convictions for armed robbery pursuant to La.R.S. 14:64 and second degree battery pursuant to La.R.S. 14:34.1 are affirmed.

**AFFIRMED.**