# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-210


**STATE OF LOUISIANA**

**VERSUS**

**WILLIAM CHESTER FARRY JR.**
**A/K/A WILLIAM CHESTER FARRY**
**A/K/A WILLIAM C. FARRY**
**A/K/A WILLIAM FARRY**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 31701-11
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


**D. KENT SAVOIE**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion,
and D. Kent Savoie, Judges.


**AFFIRMED.**

**John Foster DeRosier**
**District Attorney**
**Karen McLellan**
**Ross M. Murray**
**Carla S. Sigler**
**Assistant District Attorneys**
**Fourteenth Judicial District Court**
**Post Office Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **William Chester Farry Jr.**

**WILLIAM CHESTER FARRY JR.**
**A/K/A WILLIAM CHESTER FARRY**
**A/K/A WILLIAM C. FARRY**
**A/K/A WILLIAM FARRY**
**General Population**
**Louisiana State Prison**
**Angola, LA 70712**

**SAVOIE, Judge.**

The Defendant, William Farry, was convicted by a jury of armed robbery, a violation of La.R.S. 14:64. The State charged the Defendant as a habitual offender. The trial court found the Defendant to be a third habitual offender and sentenced him to life imprisonment. The Defendant now appeals his conviction.[1]

The Defendant, through his attorney, assigns two errors:

     1. The circumstantial evidence in this case was insufficient to convict the Defendant of armed robbery.

     2. The trial court erred by not granting the Defendant's Pro Se Motion for a New Trial due to an improper ruling on the admissibility of evidence during the pretrial *Prieur* hearing and a lack of reasonable notice.[2]

Additionally, the Defendant assigns two pro se errors:

1. The State failed to prove, by clear and convincing evidence, other crimes evidence.

2. Trial court erred in denying the Defendant's motion for new trial.

After a review of the record, the Defendant's conviction is affirmed.

## FACTS

In May 2009, someone entered James Fodrie's (Mr. Fodrie) home armed with a baseball bat. The robber took fifteen dollars ($15.00), a gun, and a coin bag containing mostly German coins and currency.

The trial was held six years later in June 2015.

That same night, prior to the robbery, Mr. Fodrie, ran into Bridgette Bass Schwarz (Ms. Schwarz) at a bar called "Detour" that he often frequented. Mr. Fodrie knew Ms. Schwarz as she had previously worked as a bartender at Detour.

---

[1] The Defendant appeals his sentence in *State v. Farry*, 16-211, which is also pending.

[2] *State v. Prieur*, 277 So.2d 126 (La.1973).

Mr. Fodrie recalled Ms. Schwarz entered with two men and then approached him. After talking for a while, Ms. Schwarz asked Mr. Fodrie if she could eat supper at his house. Mr. Fodrie went home and began cooking supper when Ms. Schwarz called and asked him to pick her up at her home in Westlake, Louisiana. Mr. Fodrie lived in Sulphur, Louisiana. Mr. Fodrie estimated that it took him twenty minutes to travel to her house. Once they arrived at Mr. Fodrie's home and talked for a while, Mr. Fodrie recalled Ms. Schwarz took a phone call and walked outside. Around five minutes after Ms. Schwarz returned from outside, the robber, carrying a baseball bat, entered the home. Mr. Fodrie recalled the robber had on a black sweatshirt with a hood, a white mask, and white gloves. The robber asked him for money, and Mr. Fodrie took $15.00 dollars out of his shirt pocket and threw it on the coffee table. The robber instructed Mr. Fodrie and Ms. Schwarz to get on the floor, and the robber instructed Ms. Schwarz to tie up Mr. Fodrie with a phone cord. The robber then tied up Ms. Schwarz and placed Mr. Fodrie and Ms. Schwarz in a closet. Mr. Fodrie was of the opinion that the robber was a man based on his voice. He did not find anything strange about the voice. According to Mr. Fodrie, the robber took his gun, his coin collection contained in a black coin bag, and Mr. Fodrie and Ms. Schwarz's cell phones.[3] The gun and the coin collection were kept in the drawer in Mr. Fodrie's bedside table. After the robber left, Mr. Fodrie and Ms. Schwarz went to the neighbor's home and called 911.[4] The call was made at approximately 10:12 p.m.

At trial, Mr. Fodrie identified the black pouch given to police as the one that was stolen from him. Mr. Fodrie explained that, after the robbery, he did not see

---

[3]The black bag contained assorted coins and bills.

the stolen coins until he was called to the police station two years later. Mr. Fodrie testified as to what was in the black coin bag, explaining, in pertinent part:

A. Yeah, I got some of the Deutsche marks and the pennies and -- five pennies, marks in different denominations, the German Deutsche mark and the pennies. Fifty Deutsche marks and your twenty Deutsche mark.

Q. Let's talk specifically about how you came into possession of the coins and those marks.

A. This is money and everything that I carried with me and everything when I was stationed in Europe when I was in the Army and this is the money that I brought back from Germany with me, and it's just of sentimental value, but what else I had in this here at the time was Liberty halves. I had some 1800 silver dollars. I have the Anthony dollars, the gold dollars. I had some buffalo nickels, wheat dimes, and one penny that was 1926 and everything I kept just because of the age. I mean I had various different coins that was collectors.

Q. And --

A. That are no longer here.

Q. And those items -- some of those items that you had just mentioned are missing from there?

A. Yes.

Mr. Fodrie testified Ms. Schwarz was not left alone in his home, and she did not go into his bedroom

Ms. Schwarz testified that, at the time the offense occurred, she lived with the Defendant who was her boyfriend. Her daughters Kristin and Kari Bass lived with her off and on. She recalled that, on May 30, 2009, she, the Defendant, and two other men were sitting around her home. Ms. Schwarz stated that the two men grabbed her, and the Defendant injected her with cocaine after which she passed out on the bed for an hour. She was awakened by the Defendant. Ms. Schwarz further testified, in pertinent part:

A. When I woke up they were crushing the pills upon the dresser and melting them and putting water over them and trying to put them in a Visine bottle, and they told me to get dressed, so I was getting dressed and then the other two guys left and then Will informed me what he wanted me to do.

Q Now, at this time you've already been injected supposedly?

A. Yes sir.

Q. And what did you think about this?

A. I was scared.

Q. Why didn't you notify some authorities?

A. I was scared. I'm high on cocaine. My state of mind, I was high on cocaine. This is somebody that I've dated.

Another friend of the Defendant's, referred to as "Johnny Cash," came by the home between thirty minutes and an hour later. The Defendant wanted Ms. Schwarz to go into a bar, put Xanax in a patron's drink, and lure the patron out of the bar for the Defendant to rob. The three left the home to carry out the Defendant's plan.

Ms. Schwarz testified that, after she came out of the first bar, the Defendant punched her because she did not find anyone to drug. After going to two or three bars, the Defendant told her to give him the Visine bottle, and they would order a drink. Ms. Schwarz did not put Xanax in anyone's drink. She testified that she thought the plan to rob someone had been abandoned.

Around 5:30 p.m., the three entered Detour bar. Ms. Schwarz began talking to Mr. Fodrie whom she knew from previously working as a bartender at Detour. After being in the bar for twenty-five to thirty minutes, the Defendant told her it was time to leave. Ms. Schwarz thought the Defendant was jealous. Mr. Fodrie and Ms. Schwarz made plans to meet for supper at Mr. Fodrie's home, and Ms.

Schwarz then returned to her home. There was no testimony that the Defendant was involved in the plan to meet for supper. According to Ms. Schwarz, Mr. Fodrie called her and asked her to come over to his home and eat fish. Ms. Schwarz asked Mr. Fodrie to pick her up from her home in Westlake. Ms. Schwarz estimated that it took twenty or so minutes for him to get to her home. She testified that she arrived at Mr. Fodrie's home between 9:30 and 10:00 p.m.

After arriving and talking for a while, Ms. Schwarz remembered receiving a call from the Defendant. He told her that he knew where she was, and he was coming to get her. Ms. Schwarz told him to calm down. After returning inside the trailer, Ms. Schwarz dropped her phone in her purse. She testified that, five to ten minutes later, the robber burst through the door. The robber was carrying a baseball bat, and he wore a black hoodie turned inside out and a black mask. It was Ms. Schwarz's testimony that the robber had a deep male voice. She was of the opinion that the robber was attempting to change his voice. The robber instructed her to tie up Mr. Fodrie with a telephone cord. The robber then tied up Ms. Schwarz. The robber tried to use Ms. Schwarz's belt but the belt broke, and the robber used something else. Ms. Schwarz stated the robber placed his hand down the back of her pants. Next, the robber put both of them in a closet. Ms. Schwarz recalled hearing the robber going through the trailer.

After the robber left, Ms. Schwarz and Mr. Fodrie called the police from his neighbor's home. Mr. Fodrie then took Ms. Schwarz home and the Defendant was home when she arrived. She informed the Defendant what happened to her that night, and his response was cold and unemotional. Two days later, she saw the Defendant with a black coin bag. The Defendant told Kristin he received the black

5

coin bag from his uncle. Ms. Schwarz recalled that the Defendant kept the coin bag on his person "at all times."

Three or four days after the robbery, the police called and wanted to question Ms. Schwarz about the robbery. This made the Defendant angry, and Ms. Schwarz testified that she and the Defendant had a big fight. The Defendant packed his bags and planned to leave the home. At trial, the following pertinent exchange between Ms. Schwarz and the State occurred:

A. Yes. Well, that begin the argument and then we just started arguing and he was mad and he started rambling and I told him he needed to get a job and he was mad about me saying that, and then he started saying that he -- that I need to calm down and listen to him and do what he says.

Q. Okay.

A. That he knows how I feel about him, that he's heard me talk to people, and that he has the coins and I just need to stay where I'm at basically.

Q. Okay. Did he mention anything else to you that led you to believe that he had taken part in the robbery?

A. He said he would do to me what he's done to my friends.

Q. Okay. Did he mention anybody specifically that he had done anything to?

A. No, not that I can remember.

Q. Okay. Were there any details that came out regarding the robbery?

A. He said he used my clothes and my stuff and I couldn't figure out what that meant or what he meant because he was rambling and he was packing.

Q. Why was he packing?

A. He was leaving. Me and Will had an on and off relationship. He went to his dad's a lot.

Q. Okay. So he's rambling on and on about, you know, doing to you what he had done to other people?

A. Yes.

Q. And using your clothing?

A. Yes.

Q. Let me ask you this. Did he ever have an occasion to wear your clothing before?

A. Yes. He wore hoodies and jackets and stuff like that.

Q. Okay. As he is -- you said he was packing his things?

A. Yes.

Q. What's going on?

A. He's yelling and ranting and raving and once I realized what he meant by he used my stuff, he had put the coins on the bed.

Q. Okay.

A. And he was going to the bathroom. He had been taking his stuff out of the closet and my bed is right here and the closet is right here, and he's putting them on there and he had put the coins on the bed.

Q. Okay.

A When he goes to get his shaver out of the bathroom I took the coins and I slid them. I had a sleigh bed and there's wood on each side of it and there's a wood little piece, so it would catch the bag.

Q. It kind of curves a little bit?

A. Yes.

Q. Okay.

A. And I slid it there and he was looking for the bag and looking for the bag, unpacked stuff looking for the bag, and then he finally just packed everything up and left.

Q. Okay.

A. He had come back that evening again to look for the bag.

Q. He wanted those coins?

A. Yes, he wanted that bag.

The Defendant did not find the coin bag. Ms. Schwarz testified that she placed the coin bag in a safe located at her home, and the Defendant did not have the combination to the safe. She and her ex-husband were the only ones with the combination.[5] Ms. Schwarz had possession of the coin bag until she gave it to the police two years after the robbery.

In Ms. Schwarz's initial interview with police directly after the incident and in her second interview with police several days after the robbery, she did not tell the police of the Defendant's involvement in the robbery. At trial, Ms. Schwarz admitted that she lied to police about her drug use and the Defendant's plan for her to lure someone for him to rob.[6] Ms. Schwarz testified that she did not tell police about the Defendant robbing Mr. Fodrie during the next two years because she feared for herself and her family.

Two years after the robbery, Ms. Schwarz was in jail on drug charges.[7] Ms. Schwarz recalled that the Defendant visited her in jail along with her daughters and grandchild. According to Ms. Schwarz, she argued with the Defendant about him not giving her things to her ex-husband. At that point, the Defendant threatened her and her family.

Ms. Schwarz testified that, due to the threat by the Defendant, on June 10, 2011, she gave a statement (her third statement) to police implicating the

---

[5]Ms. Schwarz testified that her ex-husband paid her bills and took care of her and her girls.

[6]The record is unclear as to what exactly was said to police during the second interview. Although Ms. Schwarz testified that the Defendant confessed to her that he had robbed Mr. Fodrie's home before this second interview, the record indicates Ms. Schwarz did not tell the police about the Defendant's admission at the second interview.

[7]Ms. Schwarz pled guilty to drug charges (possession of marijuana and CDS II) and was sentenced to ninety days in jail and to two and one-half years of probation.

Defendant as the robber of Mr. Fodrie's home.  Ms. Schwarz explained, in the following exchange, how the police came into possession of several pieces of evidence:

Q. In the days that followed the sheriff's department comes into possession of a couple of pieces of evidence?

A. Yes sir.

Q. And the first thing that they get is a sweatshirt, correct?

A. Yes sir.

Q. How did they get that sweatshirt?

A. I had found my sweatshirt. I had two black sweatshirts and when Will had mentioned that I was looking for my other sweatshirt and it was in the wash, which I found funny because I hadn't wore it.

Q. Okay.

A. And my daughter, Kristin, hadn't been there. She had been at her father's, it was during the summer.

. . . .

Q. Sweatshirt, a hoodie, is one piece of evidence that came into the possession of the sheriff's department.

A. Yes sir.

Q. A few days later there's a pouch with coins?

A. Yes sir.

Q. How did that come into possession of the sheriff's department? Now, at this time you had indicated that you had never taken it out of your safe; is that correct?

A. That's correct.

Q. Was it still in the safe at that time?

A. Yes sir.

Q. How did it make its way to the sheriff's department?

9

A.  My daughter.

Q.  What happened with that?

A.  She come [sic] to visit me and I told her I needed her to get some stuff and bring them [sic] down to the police department and tell them that I sent it to them and to have them come talk to me.

On cross-examination, Ms. Schwarz testified that, when she was at the victim's home, she did not know the Defendant was planning on robbing the victim; she thought the Defendant had abandoned his earlier plan to rob someone. Additionally, she stated that she did not give the Defendant the victim's address because she did not know it. Then, the following pertinent exchange occurred on cross-examination:

A. How did you know following your phone calls while at Mr. Fodrie's house that Mr. Farry followed you to the house?

A. When we was in the big fight, I had mentioned the big fight where a detective called me, and Brent -- Detective Brent Young called me and when he was agitated, that's when it all came out that he followed me, he heard what we were saying, and he had got the -- he had stole his -- his words was he has got stuff from somebody that I knew, wore my stuff to do it, and he knows where-- I know what he's capable of.

Q. How did you determine this, the last statement--

A. He -- go ahead.

Q. --who told you?

A. Who told me? William Farry.

Q. How did you know that William Farry followed you to Mr. Fodrie's house?

A. I found out later the exact events from him.

Q. And under what circumstances did --

A. When we were arguing about him not wanting me to go give a statement to Detective Young. He didn't -- he told me I didn't need to go back up there, that I'd gave a statement.

Ms. Schwarz admitted that she went to the bathroom alone when she was at Mr. Fodrie's home.

Seventeen year old Kristin Bass (Kristin), Ms. Schwarz's daughter, testified that, in May 2009, she was eleven or twelve years old. She recalled that the Defendant had a bag of foreign coins.

Robert Broussard, custodian for the Calcasieu Parish 911 records, testified that the records of May 2009 indicated a call at 10:12 p.m. for a robbery at 1875 Marseillaise Drive in Sulphur, Louisiana.

Scott Patch, previously with the Calcasieu Parish Sheriff's Office, responded to a call of armed robbery at Marseillaise Drive. When he drove up to the address, Mr. Fodrie and Ms. Schwarz were standing outside of the trailer. He recalled that Mr. Fodrie stated a person forced his way into his trailer, the robber wore all black and a Halloween mask, and carried a baseball bat. The officer testified that Mr. Fodrie told him the robber took his wallet from his shirt pocket.

Detective Brent Young, employed by the Calcasieu Parish Sheriff's Office, testified that he investigated the May 2009 robbery of Mr. Fodrie's home soon after the robbery. He stated that he interviewed Mr. Fodrie and Ms. Schwarz. From Ms. Schwarz, he learned about the phone calls between her and the Defendant while she was at Mr. Fodrie's home. Although the detective supboened AT&T for phone records, he received no results, which indicated to him that the phone was probably from a pre-paid service. He recalled there was a "revolver" and cash missing from Mr. Fodrie's house. Additionally, Detective Young testified that Ms. Schwarz's credit card and cell phone were missing, but they were later found in her purse. Detective Young stated that Ms. Schwarz did not indicate when the phone was found. He explained that he had no leads on the case until

11

two years later when Ms. Schwarz came to him and turned over two pieces of evidence: the black sweatshirt and the foreign coins.

Kari Bass Gaskin (Kari), Ms. Schwarz's other daughter, testified that, in June 2011, Ms. Schwarz asked her to get her black sweatshirt from her home in Westlake. Kari recalled that she found the sweatshirt in the closet and brought it to the police station. A few days later, her mother asked her to get the coins from the safe located at Kari's father's home. According to Kari, her mother told her that the Defendant stole the coins. She also recalled seeing the Defendant with the coins when they all lived together. Kari gave both of the items to the police.

Police also gathered other evidence during their investigation which included a black belt and a phone charger cord.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent present.

## ASSIGNMENT OF ERROR NUMBER ONE

The Defendant argues that the circumstantial evidence presented by the State was insufficient to convict him of armed robbery. He explains the witnesses could not identify him as the robber as they did not see the robber's face. The Defendant argues, "the only evidence arguably implicating William was circumstantial testimony by Bridgett Bass [Ms. Schwarz] and evidence that *she* produced two years after the case had gone 'cold'." The Defendant contends Ms. Schwarz lied multiple times to the police. He points out the testimony of Ms. Schwarz was inconsistent. The Defendant highlights the evidence was in Ms. Schwarz's possession for two years after the robbery before she turned it over to the police.

One of the pieces of evidence, Ms. Schwarz's black sweatshirt that she claims was worn inside out by the Defendant when he committed the robbery, was given to police two years after the robbery. The Defendant explains:

> Yet, Ms. Bass said she was only sure that William wore her sweatshirt *after* later seeing it with the dirty laundry. In other words, when Ms. Bass saw the sweatshirt on the intruder at Mr. Fodrie's house she was not *then* able to identify the sweatshirt as hers and, thus, William as the intruder. She only later came to that conclusion after making several *assumptions*. *See, e.g.*, (Ms. Bass stated that she only "realized" William used her sweatshirt *during their argument* several days after the robbery) and (Ms. Bass did not initially think she knew who the intruder was, rather she "discovered . . . the real story [later] . . . ."). Furthermore, she never told police at the time of the incident that she noticed the perpetrator wearing *her* sweatshirt or that the sweatshirt that was worn was turned inside out.

The Defendant accuses Ms. Schwarz of taking the coins while she was at the victim's home. In support of this accusation, the Defendant notes Ms. Schwarz admitted she went to the restroom at Mr. Fodrie's alone.

The State responds the Defendant failed to present any evidence in support of the allegations that Ms. Schwarz and her daughters lied. The State argues that the jury believed Ms. Schwarz despite being made aware of her drug use and lying to police.

There is no dispute a robbery took place and that Ms. Schwarz, through her daughters, turned over the stolen foreign coins and currency belonging to the victim to the police. The question is whether the State proved beyond a reasonable doubt that the Defendant was the perpetrator of the offense.

Louisiana Revised Statues 14:64 provides in pertinent:

> A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

In *State v. Cox*, 13-305, pp. 1-2 (La.App. 3 Cir. 10/9/13), 124 So.3d 523, 524-25, this court set forth the applicable law when the identity of the offender is at issue, explaining in pertinent part:

> In *State v. Dotson*, 04-1414, pp. 1-2 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312, this court has explained the insufficiency analysis as follows:
>
> > In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La.4/3/02), 815 So.2d 50.
>
> *State v. Chesson*, 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied*, 03-2913 (La.2/13/04), 867 So.2d 686.
>
> > Further, when the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.
>
> Furthermore, included with proving the elements of an offense is the necessity of proving the identity of the offender. When the key issue in a case is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. McGee*, 04-963 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, *writ denied*, 05-593 (La.5/20/05), 902 So.2d 1050.

*See also*, *State v. Gildhouse*, 13-296 (La.App. 3 Cir. 10/9/13), 123 So.3d 888, *writ denied*, 13-2638 (La. 4/25/14), 138 So.3d 643.

In *State v. Jones*, 08-687, p. 11 (La.App. 3 Cir. 12/10/08), 999 So.2d 239, 247, this court wrote:

> [I]n the absence of internal contradiction or irreconcilable conflict with physical evidence, a witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. White*, 28,095 (La.App. 2 Cir. 5/8/96), 674 So.2d 1018, *writs denied*, 96-1459 (La.11/15/96), 682 So.2d 760; 98-282 (La.6/26/98), 719 So.2d 1048. Furthermore, regarding inconsistencies between a witness's pre-trial statement and his trial testimony, this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):
>
> > When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

The only direct evidence presented was Ms. Schwarz's testimony that the Defendant told her he committed the crime and the testimony of Ms. Schwarz's daughters, Kristin and Kari, that they saw the Defendant with the coins. While Ms. Schwarz gave prior inconsistent statements, the jury clearly believed her trial testimony. It is the factfinder who "weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *State v. Bright,* 98-0398, p. 22 (La. 4/11/00), 776 So.2d 1134, 1147. We find that, viewing the evidence in the light most favorable to the State, the State met its burden of proof as to the identity of the robber.

## ASSIGNMENT OF ERROR NUMBER TWO
## and PRO SE ASSIGNMENT OF ERROR NUMBER TWO

The Defendant argues that the trial court erred in denying his motion for new trial in which he argued the trial court erred in admitting other crimes evidence.

The Defendant contends that, right before the trial began, he was informed Ms. Schwarz claimed two other men were involved in holding her down when the Defendant shot her up with drugs. Ms. Schwarz asserts the Defendant paid these men with drugs. Additionally, Ms. Schwarz states she was given a bottle of Visine that contained Xanax to drug the bar patrons. The Defendant contends the trial court erred in ruling this was res gestae. The Defendant argues it should have been considered evidence under La.Code Evid. art. 404(B) and notice should have been given. He asserts the unreasonable notice of this evidence violated his right to a fair trial and to prepare a defense. The Defendant contends he did not have the opportunity to investigate the allegations.

On June 12, 2015, the State filed in the trial court a motion regarding introduction of res gestae and, in the alternative, other crimes evidence. In the motion the State set forth the other crimes evidence writing:

> The State seeks the introduction of the following evidence against the defendant: Bridgette Bass---a former girlfriend of the defendant, and a witness to be called by the defendant at trial; the defendant injected her with cocaine, which caused her to lose consciousness. Upon her being awakened by the defendant, she was ordered by him to get dressed and ready to leave. She observed the defendant crushing Xanax pills and mixing them with a liquid. When Bass, the defendant, and a third individual arrived at a bar, the defendant handed Bass a Visine eye drops bottle and told her to squirt the liquid into the drink of a bar patron prior to leading the patron out of the bar to get robbed by the defendant. After failed attempts at two different bars, the defendant physically struck Bass for not doing as she was ordered. This is evidence of defendant's plan, preparation, opportunity, and intent in committing a robbery, which he ultimately succeeded in doing. The defendant could not have accomplished his crime without using Ms. Bass to distribute this Visine mixture to the victim of his crime.

The hearing on the motion was held on June 15, 2015, which was the day before the trial commenced. At the conclusion of the hearing, the Defendant argued in pertinent part:

16

[T]he State is attempting to show the character, that it's [sic] a bad person, and the discovery from the defense point of view does not indicate that.

Now, in viewing it the Court should actually use a balancing test based upon what one individual has said who is actually in possession of the coins, who has access to the coins, who has the combination to the coins, and that would beg the question of the validity of anything that she said as it relates to *Prieur* evidence. The prejudicial impact would unfairly prejudice this defendant and his ability to thoroughly represent himself and on top of that factor, because I received this information within the last two days, it is my opinion that this information is inconsistent with what I have been studying in regards to this case, but to get it over the weekend?

The State pointed out that the evidence sought to be admitted about Ms. Schwarz's being injected with cocaine, going to the various clubs with the Defendant and "Johnny Cash," and planning to find somebody to rob was contained in the police reports. The Defendant's attorney responded that this was the first time he heard about putting Xanax in a Visine bottle. Additionally, the Defendant's attorney argued in pertinent part:

[I]n this case it is argued that the State simply seeks to include what it considers other crimes evidence in regards to establishing a pattern. The actual evidence that we have, which is in the discovery, is contrary to some of the things that have happened here. We feel that with a trial it can be established; however, the integral part of this evidence is more prejudicial than probative as it relates to the rights of the defendant based upon what has already been studied in regards to the incident. There may actually be a specific motive on behalf of Ms. Bass [Ms. Schwarz) to gain something of value, probably to assist herself in these circumstances, and the State is attempting to show the character, that it's a bad person, and the discovery from the defense point of view does not indicate that.

The trial court found the evidence constituted res gestae, stating in pertinent part:

THE COURT:

All right. I do find that, you know, based on listening to the testimony of the witness that this is classic res gestae integral acts evidence because it does tend to show the defendant's plan, motive,

17

intent, preparation that day for the commission of the crime. So I am going to allow. . . .

Absent an abuse of discretion, a trial court's ruling on the admissibility of other crimes evidence will not be disturbed. *State v. Vail*, 14-436 (La.App. 3 Cir. 11/5/14), 150 So.3d 576, *writ denied*, 14-2553 (La. 8/28/15), 176 So.3d 401.

In *State v. Sumrall*, 09-1216, pp. 29-30, (La.App. 3 Cir. 4/7/10), 34 So.3d 977, 993-94, *writ denied*, 10-1020 (La. 12/10/10), 51 So.3d 722, this court explained admissibility of other crimes evidence, writing in pertinent part:

> The Louisiana Supreme Court discussed the admissibility of other crime [sic] evidence when it relates to conduct formerly known as *res gestae* in *State v. Taylor*, 01-1638, pp. 10-12 (La.1/14/03), 838 So.2d 729, 741-43, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004):
>
>> Generally, courts may not admit evidence of other crimes to show defendant is a man of bad character who has acted in conformity with his bad character. However, under La. C.E. art. 404(B)(1) evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as *res gestae*, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." *Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence "to insure that 'the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.' " *State v. Colomb*, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting *State v. Haarala*, 398 So.2d 1093, 1098 (La.1981)). The *res gestae* doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. *State v. Huizar*, 414 So.2d 741, 748 (La.1982); *State v. Kimble*,

18

407 So.2d 693, 698 (La.1981). In addition, as this court recently observed, integral act (*res gestae*) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its "narrative momentum and cohesiveness, 'with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.' " *Colomb*, 747 So.2d at 1076 (quoting *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).

The *res gestae* doctrine in Louisiana is broad; it includes the testimony of witnesses "pertaining to what they heard or observed before, during, or after the commission of the crime, if the continuous chain of events is evident under the circumstances." *State v. Williams*, 614 So.2d 252, 254 (La.App. 3 Cir.1993).

In *State v. Arvie*, 97-990, pp. 15-16 (La.App. 3 Cir. 2/4/98), 709 So.2d 810, 818, *writ denied*, 98-2461 (La. 1/29/99), 736 So.2d 827, the court explained: "'Evidence admissible under the res gestae exception to the general inadmissibility of other crimes evidence is not subject to any notice requirements.' *State v. Velez*, 588 So.2d 116, 128 (La.App. 3 Cir.1991), *writ denied*, 592 So.2d 408 (La.1992), *certiorari denied*, 505 U.S. 1220, 112 S.Ct. 3031, 120 L.Ed.2d 901 (1992) citing *State v. Prieur*, 277 So.2d 126 (La.1973)."

In this case, the trial court found the evidence constituted res gestae; thus, according to *Arvie*, the Defendant was not entitled to notice. However, in this case, the State gave the Defendant notice, and a hearing on the admissibility of the evidence was held.

The Defendant argues the evidence did not constitute res gestae, and the trial court erred in allowing it. In *State v. Taylor*, 01-1638, p. 10 (La. 1/14/03), 838 So.2d 729, 741, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036 (2004), the court explained, "*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not

19

accurately present its case without reference to them." In *State v. Odenbaugh*, 10-268, pp. 51-54 (La. 12/6/11), 82 So.3d 215, 251-52, *cert. denied*, ___ U.S. ___, 133 S.Ct. 410 (2012), the court explained in pertinent part:

> Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. *State v. Hatcher*, 372 So.2d 1024, 1033 (La.1979); *State v. Sutfield*, 354 So.2d 1334, 1337 (La.1978); *State v. Jackson*, 352 So.2d 195, 196 (La.1977); *State v. Ledet*, 345 So.2d 474, 479 (La.1977).
>
> . . . .
>
> Moreover, erroneous admission of other crimes evidence is subject to a harmless-error analysis. *See, State v. Maise*, 00-1158, pp. 8-9 (La.1/15/02), 805 So.2d 1141, 1147-1148; *State v. Tyler*, 97-0338, p. 14 (La.9/9/98), 723 So.2d 939, 947; *State v. Johnson*, 94-1379, p. 15 (La.11/27/95), 664 So.2d 94, 101. An error is harmless if the jury's verdict actually rendered at trial was "surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *cf. Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (O'Connor, J.) (harmless-error analysis begins with the premise that the evidence admitted at trial is sufficient to support the verdict and asks whether the state can prove " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' ") (quoting *Chapman v. California*, 386 U.S. 18, 22-24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

We find the trial court did not err in ruling the evidence was res gestae. Accordingly, we find this assignment lacks merit.

## PRO SE ASSIGNMENT OF ERROR NUMBER ONE

The Defendant argues that the State failed to prove by clear and convincing evidence the other crimes, wrongs and acts admitted by the trial court at trial. The Defendant urges no credible evidence was presented to prove he committed the other crimes, wrongs, or acts. The Defendant contends this evidence was prejudicial to him in that without it the jury would not have reached the verdict he was guilty beyond a reasonable doubt.

In *State v. Cash,* 03-853, pp. 15-16 (La.App. 3 Cir. 12/10/03), 861 So.2d 851, 860-61, *writ denied*, 04-27 (La. 4/30/04), 872 So.2d 472, *and writ denied*, 04-232 (La. 5/7/04), 872 So.2d 1080, this court examined the applicable burden of proof in this type of case explaining in pertinent part:

> Accordingly, we shall begin our analysis of this issue with Judge Katz's dissent in *State v. Pollard*, 98-1376 (La.App. 4 Cir. 2/9/00), 760 So.2d 362, 373 (emphasis added), where he observed:
>
> > The court in *State v. Pardon*, 97-248 (La.App. 5 Cir. 10/15/97), 703 So.2d 50, 57, *writ denied*, 97-2892 (La.3/20/98, 715 So.2d 1207), stated:
> >
> > > La.Code Evid. Art. 1104, added by Acts 1994, 3rd Ex.Sess. No. 51, § 2, changed the burden of proof. It provides: "The burden of proof in a pretrial hearing held in accordance with *State v. Prieur*, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404." That burden of proof was enunciated in *Huddleston v. U.S.*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), as follows:
> > >
> > > "We conclude that [Rule 404(b)] evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.* * * The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence. (citations omitted)" [sic]
> >
> > The court in *Pardon* then concluded: ". . . we find the State carried its burden of proving the prior bad acts by a preponderance of the evidence." *Pardon*, *supra*, at p. 58. However, footnote # 1 in *Pardon* states: "Because La.Code Evid. Art. 1104 refers to the burden of proof at a hearing only, *the impact of this article on the burden of proof at trial is unknown at this point*." See Pugh, Force, Rault & Triche, "Handbook on Louisiana Evidence Law".
>
> Our review of the jurisprudence since *Pollard* reveals the impact of Article 1104 on the burden of proof at trial remains

21

unresolved in Louisiana. For this reason, and because the relevant state law apparently requires that we follow federal law in determining the burden of proof, we shall refer to the Supreme Court of the United States. We have noted that the Supreme Court, in discussing the standard for admissibility of other crimes evidence in *Huddleston v. U.S.*, 485 U.S. 681, 690, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771, (1988) (emphasis added), stated that the court should decide "whether the jury *could reasonably find* the conditional fact . . . by a preponderance of the evidence."

This language suggests the *Huddleston* court contemplated that juries would employ the preponderance standard in their assessments of other crimes evidence. Further, the Supreme Court's language in *Dowling v. U.S.*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), a collateral estoppel case, appears to take the same view. In explaining why collateral estoppel did not apply, the Supreme Court noted:

> '[S]imilar act evidence is relevant only if the jury *can reasonably conclude* that the act occurred and that the defendant was the actor.' Because a jury might reasonably conclude that [defendant] was the masked man who entered [victim's] home, even if it did not believe beyond a reasonable doubt that [defendant] committed the crimes charged at the first trial . . . the Double Jeopardy Clause is inapposite.

*Dowling*, 493 U.S. at 348-49, 110 S.Ct. at 672, citing *Huddleston*, 485 U.S. at 689, 108 S.Ct. at 1501 (emphasis added).

Therefore, following the *Huddleston* and *Dowling* cases, we find that the preponderance of evidence standard, rather than a clear and convincing standard of proof, shall apply to both pretrial and trial admissibility involving other crimes evidence. Thus, the trial court did not err in its instruction. Defendant's fourth assignment of error lacks merit.

Additionally, this court has held that "clear and convincing evidence is not required; instead, a preponderance of the evidence standard applies." *State v. Carmouche*, 14-215, p. 3 (La.App. 3 Cir. 7/30/14), 145 So.3d 1101, 1103-04, *writ denied*, 14-1819 (La. 4/2/15), 176 So.3d 1031 (citing *Cash*, 861 So.2d 851).

However, in *Vail*, 150 So.3d 576, this court held it was the State's burden to prove that a defendant committed the other crimes, wrongs, or acts by clear and

convincing evidence. *Id.* (citing *State v. Prieur*, 277 So.2d 126 (La.1973) and *State v. Stevens*, 11-175 (La.App. 3 Cir. 10/5/11), 74 So.3d 803, *writ denied*, 11-2496 (La. 3/30/12), 85 So.3d 115).

In *State v. Rose*, 06-402 (La. 2/22/07), 949 So.2d 1236, the court noted that the applicable burden was unclear, writing in a footnote:

> [Louisiana Code of Evidence Article] 1104 states:
>
> > The burden of proof in a pretrial hearing held in accordance with *State v. Prieur*, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
>
> > This court has not yet addressed the extent to which Article 1104 and the burden of proof required by the federal rules, as interpreted in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), has affected the burden of proof required for the admissibility of other crimes evidence. *State v. Jacobs*, 99-0991, p. 26 n. 15 (La.5/15/01), 803 So.2d 933, 952 n. 15; *State v. Cotton*, 00-0850, p. 11 n. 3 (La.1/29/01), 778 So.2d 569, 578 n. 3. In the instant case, we need not reach the issue of the applicable burden of proof because we find that the State satisfied its burden under either the clear and convincing evidence standard or the preponderance of the evidence standard.

*Id.* at 1243 n.3. Thus, it is unclear which standard is applicable.

As noted above, the erroneous admission of other crimes evidence is subject to a harmless error analysis. *Odenbaugh*, 82 So.3d 215.

In this case, even assuming the State failed to satisfy its burden under either standard, this court finds it would be harmless error. Excluding the evidence of the alleged bad acts, this court finds Ms. Schwarz's testimony that the Defendant confessed he committed the crime to her was sufficient to support the Defendant's conviction. Thus, this claim lacks merit.

23

## **DECREE**

For the foregoing reasons, the Defendant's conviction is affirmed.

**AFFIRMED.**